IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

YVETTA WILSON-NETTERS              )
*on behalf of* RSW,                )          CASE NO. 1:19-cv-02163
                                   )
              Plaintiff,           )          JUDGE SOLOMON OLIVER, JR.
                                   )
        v.                         )          MAGISTRATE JUDGE
                                   )          KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL,            )
SECURITY ADMINISTRATION,           )
                                   )          **REPORT AND RECOMMENDATION**
              Defendant.           )

Plaintiff Yvetta Wilson-Netters ("Plaintiff") *on behalf of* RSW, a minor ("Claimant" or

"RSW"), seeks judicial review of the final decision of Defendant, Commissioner of Social

Security ("Commissioner"), denying an application for Supplemental Security Income ("SSI").

Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been

referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2(b)(1).

Plaintiff argues that the Court should reverse and/or remand the Commissioner's decision

because the ALJ incorrectly found that the Claimant did not continue to be disabled.  Doc. 12,

Doc. 16.  For the reasons explained below, the undersigned recommends that the Court

**AFFIRM** the Commissioner's decision.

## I.  Procedural History

Plaintiff filed an application for SSI on behalf of Claimant on October 14, 2010, alleging

that Claimant had been disabled since January 2, 2009, when Claimant was two years old.  Tr.

209-217.  On April 25, 2011, the state agency found that the Claimant was disabled as of

October 14, 2010, due to attention deficit hyperactivity disorder ("ADHD") and learning delays. Tr. 17, 91, 97.

Subsequently, the Social Security Administration ("SSA") notified Plaintiff that Claimant's case was being reviewed to determine whether he was still disabled under its rules. Tr. 97.  Following that review, on October 8, 2015, the SSA issued a "Notice of Disability Cessation" to Plaintiff notifying her that Claimant's health had improved and he no longer met the disability requirements.  Tr. 17, 97-104.  Therefore, Claimant, who was nine years old at that time, no longer qualified for SSI.  Tr. 17, 97-104.  Plaintiff had alleged that Claimant was still disabled due to learning disability and ADHD.  Tr. 97.  However, the SSA determined that the evidence showed that, although Claimant "may have some difficulty at times, he is able to pay attention, follow instructions and get along with others.  Although he may learn differently than some children, he is able to learn.  He is able to participate in activities normal for his age."  Tr. 97.

Plaintiff appealed the cessation of benefits and, on April 6, 2017, a hearing was held before a Disability Hearing Officer.  Tr. 105, 116-127, 128-138.  In a decision dated April 21, 2017, (Tr. 128-137), the Disability Hearing Officer affirmed the prior cessation date (Tr. 136).

Plaintiff requested a hearing by an administrative law judge (Tr. 149-150) and on June 13, 2018, a hearing was held before an ALJ (Tr. 49-82).  On August 16, 2018, the ALJ issued an unfavorable decision (Tr. 14-48), concluding that the Claimant's disability ended as of October 8, 2015, and the Claimant had not become disabled again since that date (Tr. 17, 42).

Plaintiff requested review of the ALJ's decision by the Appeals Council.  Tr. 206-209. On August 1, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.  On September 18, 2019, Plaintiff filed the instant action on behalf of Claimant seeking review of the Commissioner's decision.  Doc. 1.

## II. Evidence

### A.  Personal Evidence

Claimant was born in 2006.  Tr. 209.  At the time of the hearing before the administrative law judge, Claimant was 11 years old and was going into the sixth grade.  Tr. 54-55, 56.

### B.  School and Medical Evidence

An Evaluation Team Report ("ETR") was completed by the Cleveland Municipal School District in October 2009.  Tr. 461-488.  At that time, RSW had an early childhood mental health worker and developmental specialist.  Tr. 471.  RSW had been receiving speech and occupational therapy since May 2009.  Tr. 471, 484.  RSW was referred for the ETR because he was turning three years old and was receiving early intervention services for delays in communication and cognitive skills and behavioral problems.  Tr. 485, 471, 462.  The evaluation was conducted to determine eligibility for special education preschool.  Tr. 485.  With respect to RSW's educational needs, the ETR indicated that RSW needed to increase his ability to attend and focus on learning tasks; increase his compliance with adult directives and one and two step directions; increase his ability to communicate with others; and increase his level of independence.  Tr. 485.  The ETR concluded that RSW met the eligibility criteria for developmental delay – RSW was "experiencing a delay in the areas of cognitive ability and communication skills with at-risk concerns in the area of social/emotional functioning and adaptive behavior."  Tr. 487.

In July and August 2010, RSW underwent a psychological evaluation at Berea Children's Home and Family Services when he was three years old. Tr. 515-531. RSW's cognitive ability was estimated to be in the borderline range of functioning. Tr. 524. He had difficulties with verbal functioning and language development. Tr. 524. RSW exhibited difficulties with maintaining focus, inattention and hyperactivity. Tr. 524. The evaluators noted that RSW had difficulties with regard to executive functioning in the areas of attention, self-monitoring, working memory, inhibition, and planning/organizing. Tr. 524-525. If interventions related to RSW's executive functioning did not improve his receptive and expressive communication, the evaluators noted that further evaluation might be warranted to assess for the presence of ADHD. Tr. 525. The evaluators provided various recommendations for RSW, his caregivers, and his educators to implement. Tr. 525-529.

In April 2011, RSW had a speech evaluation at the Cleveland Hearing & Speech Center. Tr. 575-577. Following the evaluation, it was recommended that RSW participate in speech-language therapy one time per week for 30 minutes per session for a minimum of 6 months to address areas of difficulty, which included expressive and receptive language to allow for participation in school and home activities. Tr. 577. RSW's prognosis for age appropriate receptive and expressive language skills was good with consistent intervention and home follow-through. Tr. 577.

Another ETR was completed on February 10, 2014. Tr. 578-623. The evaluation was conducted because RSW's records indicated that RSW had "been struggling academically and behaviorally for the past two years, despite receiving interventions and accommodations to his learning." Tr. 613. RSW's academics were below grade level and there were concerns regarding RSW's motivation and emotional regulation. Tr. 613. RSW was evaluated for special

4

education eligibility.  Tr. 613.  The ETR report identified the following areas in which RSW was not achieving adequately for his age or state-approved grade level standards: reading fluency skills, written expression, mathematics calculation, listening comprehension, reading comprehension, basic reading skills, and mathematics problem solving.  Tr. 618.  The evaluation team concluded that RSW qualified for special education and related services under the category of Other Health Impairment-Minor.  Tr. 622.

On October 10, 2014, RSW had a child assessment completed at Murtis Taylor Human Services ("Murtis Taylor").  Tr. 638-653.  The assessment was completed by Cindy Ward, therapist licensed social worker.  Tr. 638.  The assessment was conducted based on RSW's mother's referral for services.  Tr. 638.  RSW's mother was concerned about behavioral problems in the classroom.  Tr. 638.  She explained that RSW had difficulties with a peer at school and he was highly sensitive and would cry easily.  Tr. 638.  RSW reported feeling sad most of the time.  Tr. 647.  He reported hearing a "soft voice" calling his name at home.  Tr. 647.  Ms. Ward's assessment was dysthymic disorder and disruptive disorder, NOS.  Tr. 649.  She assessed a GAF score of 35.[1]  Tr. 649.  RSW's mother was reluctant to consider medication but she was willing to consider a psychiatric evaluation for further evaluation because RSW reported hearing a voice.  Tr. 648.  In addition to a psychiatric evaluation, Ms. Ward recommended

---

[1] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

counseling to assist with reducing/stabilizing RSW's depression, managing his emotions and parental support.  Tr. 648.

On February 24, 2015, RSW presented to Murtis Taylor for a psychiatric evaluation which was conducted by Nancy Diffenbacher, APN.  Tr. 654-655.  RSW was in second grade. Tr. 654.  On examination, Nurse Diffenbacher noted that RSW had a sweet temperament; his mood was euthymic; he easily lost track of the subject and did not answer and seemed not to hear until redirected; his speech was soft; his intelligence was average; his concentration was moderately impaired; and his judgment/insight were intact.  Tr. 654-655.  RSW relayed that throughout the day he often heard a female call his name when he was not paying attention and it would cause him to pay attention again.  Tr. 655.  RSW noted that he felt a little nervous.  Tr. 655.  Nurse Diffenbacher assessed probable attention deficit hyperactivity disorder inattentive type and rule out absence seizure symptoms with referral to primary care physician for EEG.  Tr. 655.

RSW returned for a follow-up visit with Nurse Diffenbacher on July 13, 2015.  Tr. 656-658.  Nurse Diffenbacher noted that, in October 2014, Ms. Ward had diagnosed RSW with ADHD, predominately inattention type and adjustment disorder with mixed anxiety and depressed mood.  Tr. 656.  RSW's mother reported that RSW underwent an EEG to rule out absence seizure disorder.  Tr. 657.  RSW's mother indicated that the test was negative and she would have the report sent for inclusion in RSW's chart.  Tr. 657, 687.  Nurse Diffenbacher observed that RSW fidgeted in his seat and was distracted during the visit.  Tr. 658.  His speech was soft; his mood was euthymic; his thought process/content was logical; and his judgment and insight were intact.  Tr. 658.  Nurse Diffenbacher assessed ADHD primarily inattentive type and learning delays.  Tr. 658.  RSW's mother was hesitant to start RSW on ADHD medication

because of some problems a sibling had in the past with such treatment.  Tr. 657.  Various medication choices were reviewed and melatonin was recommended for sleep.  Tr. 658.

RSW returned to see Nurse Diffenbacher on August 17, 2015.  Tr. 659-662.  Nurse Diffenbacher started RSW on a trial of 10 mg Adderall XR.  Tr. 661.

On January 6, 2017, RSW returned to see Ms. Ward at Murtis Taylor. Tr. 712-714.  Ms. Ward noted that RSW was changing to a regular classroom at school with small group and pull out services.  Tr. 712.  RSW's teacher reported that RSW had progressed in school.  Tr. 712.  However, RSW's mother relayed that she wanted her son to continue to receive the support he had to prevent regression in school.  Tr. 712.  Ms. Ward noted that RSW's mood appeared to have improved.  Tr. 712.  It was noted that RSW had had some problems with peers at school but the problems had improved.  Tr. 712.  RSW was continuing to take melatonin to help with sleep.  Tr. 712.  He had not been taking the Adderall and there were no reports from school or home regarding the need for RSW to take it.  Tr. 712.  Ms. Ward recommended therapy to help RSW with maintaining progress emotionally and increasing his assertiveness.  Tr. 713.  She also recommended community psychiatric support services to help with assertiveness training, linkages to services, monitoring and assisting with services, and school advocacy.  Tr. 713.

RSW's first Individual Education Program ("IEP") covered the period of March 2, 2017, through March 1, 2018.  Tr. 370-389.  RSW was 10 years old and in the fourth grade.  Tr. 371.  RSW was in a general education classroom within an inclusive setting for core subjects.  Tr. 371.  He had an intervention specialist – Mrs. Townsend.  Tr. 371, 388.  It was noted that RSW always made an effort to complete his assignments but he could be easily distracted.  Tr. 371.  Occasionally, RSW had to be prompted to stay on task.  Tr. 371.  RSW's teacher reported that he could be shy and sad at times and often cried.  Tr. 372.  RSW tested in the below average range

in the areas of broad reading, letter-word identification, passage comprehension, written expression, and broad math.  Tr. 371-372.  RSW tested in the average range in the areas of spelling and expository writing samples.  Tr. 371.  RSW tested in the significantly below average range in the area of math calculations.  Tr. 372.  RSW's reading grade equivalent was a 2.2, i.e., equivalent to that of an average second grader after the second month of school.  Tr. 376.  He had not mastered his basic multiplication and division facts.  Tr. 378.

RSW saw Bonnie Kaput, APN, at Murtis Taylor on October 11, 2017, for a pharmacological management visit.  Tr. 718-719.  Nurse Kaput noted that RSW was last seen for a pharmacological management visit in June 2016.  Tr. 718.  At school, RSW was having problems staying focused, he was forgetful, and he required a lot of redirection to get his work done.  Tr. 718.  His grades were poor and he was not bringing, completing, or turning in his homework.  Tr. 718.  RSW did not have any major negative behavior issues.  Tr. 718.  It was taking RSW three hours to fall asleep but he was watching television.  Tr. 718.  RSW took naps after school.  Tr. 718.  Nurse Kaput observed that RSW's affect was appropriate; his speech was clear and distinct; his mood was euthymic; his thought processes/content was logical; and his judgment and insight were fair.  Tr. 718.  Nurse Kaput noted that RSW's medication use had been inconsistent and he had been without medication for over a year.  Tr. 718.  Nurse Kaput restarted RSW on Adderall XR but increased the dose to 15 mg due to his age and weight.  Tr. 719.

During a January 2, 2018, psychotherapy visit with Nurse Kaput, it was noted that RSW was having problems controlling his anger.  Tr. 716-717.  Nurse Kaput discussed with RSW his knowledge and use of coping skills for managing negative emotions.  Tr. 717.  RSW was able to identify situations during which he needed to use positive coping strategies.  Tr. 717.  He also

was able to identify several positive coping strategies that he used, e.g., breathing, music, getting a drink of water.  Tr. 717.

The next IEP covered the period March 1, 2018, through February 28, 2019.  Tr. 404-429.  RSW was eleven years old and in the fifth grade.  Tr. 405.  RSW was in the general education classroom for core subjects and, if needed, he received "extra pullout services" by the intervention specialist for math and ELA (English Language Arts).  Tr. 405.  He participated with his same-age peers for all encore classes, e.g., art, gym, music and media.  Tr. 405.  RSW was described as a polite and quiet and he kept to himself.  Tr. 405.  RSW preferred to work alone rather in groups.  Tr. 405.  He worked well independently and was consistently on task.  Tr. 405.  RSW took extra time that he needed to complete assignments.  Tr. 405.  He did not turn homework in on a regular basis.  Tr. 405.  RSW's Ohio State Test ELA assessment was at the limited level and he did not meet the standards for fourth grade ELA.  Tr. 405.  RSW's Ohio State Test Mathematics assessment was at the limited level and he did not meet the standards for fifth grade mathematics.  Tr. 405.  RSW's reading grade equivalent was a 3.9, i.e., equivalent to that of an average third grader after the ninth month of school.  Tt. 406.  The IEP concluded that RSW's communication skills no longer interfered with his ability to access the academic curriculum or his ability to communicate effectively at school and the IEP determined that RSW no longer required direct instruction in speech-language skills.  Tr. 406.  Therefore, his speech language services were discontinued.  Tr. 406.  RSW would continue to receive services by the regular education teacher in the general education classroom for all core classes with accommodations and modifications (e.g., direct instruction, small group setting, extended time, and frequent breaks) and the intervention specialist would provide additional services for math

and ELA.  Tr. 416.  RSW would participate with his peers for all electives (e.g., gym, media and art).  Tr. 416.

### C. Teacher and Medical Opinion Evidence

#### 1.    Intervention Specialist – Mrs. Townsend

On April 10, 2018, Mrs. Townsend, RSW's intervention specialist, completed a Teacher Questionnaire wherein she rated RSW's functioning in the following domains: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; and caring for himself.  Tr. 390-397.  Each domain contains various activities that were rated.  Tr. 391-395.  The available ratings were "no problem," "a slight problem," "an obvious problem," "a serious problem," and "a very serious problem."  Tr. 391-395.

In the domain of acquiring and using information, Mrs. Townsend found that RSW had a serious problem in two areas – expressing ideas in written form and applying problem-solving skills in class discussions; an obvious problem in four areas – comprehending and doing math problems, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, and recalling and applying previously learned material; and a slight problem in four areas – comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, and learning new material.  Tr. 391.  Mrs. Townsend explained that RSW's strongest area of academics was reading but he had some difficulties with comprehension.  Tr. 391.  She indicated that math was RSW's weakest area.  Tr. 391.

In the domain of attending and completing tasks, Mrs. Townsend found that RSW had a serious problem in three areas – carrying out multi-step instructions, organizing own things or

school materials, and completing class/homework assignments; an obvious problem in three areas – paying attention when spoken directly to; focusing long enough to finish assigned activity or task, and completing work accurately, without careless mistakes; a slight problem in four areas – refocusing to task when necessary, carrying out single-step instructions, changing from one activity to another without being disruptive, and working at reasonable pace/finishing on time; and no problem in three areas – sustaining attention during play/sports activities, waiting to take turns, and working without distracting self or others.  Tr. 392.  Mrs. Townsend explained that RSW preferred to work alone.  Tr. 392.  When RSW was in a group, he often was not focused due to various distractions.  Tr. 392.

In the domain of interacting and relating to others, Mrs. Townsend found that RSW had a serious problem in three areas – seeking attention appropriately, interpreting meaning of facial expression, body language, hints, and sarcasm, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation; an obvious problem in three areas – playing cooperatively with other children, expressing anger appropriately, and relating experiences and telling stories; a slight problem in three areas – making and keeping friends, following rules (classroom, games, sports), and introducing and maintaining relevant and appropriate topics of conversation; and no problem in four areas – asking permission appropriately, respecting/obeying adults in authority, using language appropriate to the situation and listener, and taking turns in conversation.  Tr. 393.  Mrs. Townsend noted that RSW did not have a behavior plan but they had to use strategies to manage RSW's frustrations.  Tr. 393.  Mrs. Townsend indicated that she could understand RSW's speech on the first attempt 1/2 to 1/3 of the time and she could understand his speech almost all the time after repetition or rephrasing. Tr. 394.

11

Mrs. Townsend found that RSW had no problems in the domains of moving about and manipulating objects and caring for himself.  Tr. 394, 395.

In the section of the Questionnaire captioned Medical Conditions and Medications/Health and Physical Well-Being, Mrs. Townsend was asked to answer questions regarding RSW's medication use.  Tr. 396.  In response, she indicated she did not know if medication was prescribed; she did not know if RSW took medication on a regular basis; and she did not know whether RSW's functioning changed after taking medication.  Tr. 396.  Mrs. Townsend indicated that RSW did not miss school frequently due to illness.  Tr. 396.

**2.      Nurse – Bonnie Kaput, PMHNP-BC**

On May 4, 2018, Nurse Bonnie Kaput with Murtis Taylor (Tr. 719) completed a questionnaire (Tr. 720).  Nurse Kaput indicated that RSW's diagnosis was ADHD, combined presentation for which he was taking Adderall XR 15 mg and melatonin 3 mg.  Tr. 720.   When asked whether RSW's impairment affected his ability to acquire and use information, Nurse Kaput stated that RSW was easily distracted; had difficulty focusing; and had difficulty paying attention especially to tasks that required a lot of mental effort.  Tr. 720.  When asked whether RSW's impairments affected his ability to interact with and relate to others, Nurse Kaput stated that RSW interrupted others; he was highly reactive; and he intruded on others' conversations. Tr. 720.  When asked whether RSW's impairments affected his ability to attend to and complete tasks, Nurse Kaput indicated that RSW had difficulty completing tasks and he could be disorganized.  Tr. 720.  When asked whether RSW's impairments affected his ability to care for himself, Nurse Kaput stated that RSW could be impulsive, reactive, and hyperactive and his social judgment and insight were limited.  Tr. 720.

12

### 3.     State Agency Medical Consultants

On October 8, 2015, state agency medical consultant Frank Stroebel, M.D.,[2] completed a

Childhood Disability Evaluation Form.  Tr. 670-675.  RSW's impairments were ADHD,

borderline intellectual functioning, and language delay.  Tr. 670.  Dr. Stroebel concluded that

RSW's impairments did not meet, medically equal, or functionally equal the listings and he

found that there had been medical improvement.  Tr. 670.  In reaching his findings, Dr. Stroebel

assessed RSW's limitations in six domains, finding (1) a marked limitation in attending and

completing tasks; (2) less than marked limitations in acquiring and using information, interacting

and relating with others, and caring for yourself; and (3) no limitation in moving about and

manipulating objects and health and physical well-being.  Tr. 672-673.

On January 15, 2016, state agency medical consultant Rachel Rosenfield, M.D.,[3]

completed a Childhood Disability Evaluation Form.  Tr. 676-681.  Dr. Rosenfield also found

medical improvement and reached similar conclusions regarding RSW's limitations in the six

domains with the exception of the caring for yourself domain.  Tr. 678-679.  In that domain, Dr.

Rosenfield found no limitation (Tr. 679), whereas Dr. Stroebel found a less than marked

limitation (Tr. 673).

### 4.   Consultative Evaluation

On September 4, 2015, as part of RSW's disability re-evaluation, RSW saw Michael

Faust, Ph.D., Clinical Psychologist for a psychological evaluation.  Tr. 434-440.  RSW was 8

years and 10 months old and in the third grade.  Tr. 434, 436.  When RSW's mother was asked

---

[2] Two additional medical consultants signed the form but Dr. Stroebel was the consultant with overall responsibility. Tr. 671.

[3] Two additional medical consultants signed the form but Dr. Rosenfield was the consultant with overall responsibility.  Tr. 677.

the reason for RSW's disability, she stated that RSW had "a learning disability and hyper-attention disorder." Tr. 434. RSW's mother noted that RSW was taking melatonin for sleep and he had just been prescribed Adderall XR 10 mg but, he had not started it yet. Tr. 436. RSW's mother reported that RSW had never been suspended and showed no behavioral problems in school. Tr. 436. RSW had good attendance at school. Tr. 436. RSW's mother indicated that RSW had problems "sitting still and staying focused." Tr. 436. Dr. Faust diagnosed RSW with ADHD, combined presentation and borderline intellectual functioning (estimated by review of IEP). Tr. 438.

Dr. Faust evaluated RSW's ability to function in various areas. Tr. 439-440. In the area of acquiring and using information, Dr. Faust found mild problems with attention in the one-on-one setting, noting that RSW was rather active and fidgety. Tr. 439. RSW had difficulty understanding complex or multi-step instructions and Dr. Faust found that RSW likely had difficulty learning and retaining new information and he would require more redirection to stay focused on the task. Tr. 439. In the area of attending to and completing tasks, Dr. Faust found that in the one-on-one setting RSW exhibited mild difficulty with distractibility and he was fidgety during the session. Tr. 439. Dr. Faust indicated that RSW's presentation during the evaluation was consistent with a diagnosis of ADHD and he could be expected to have difficulty sustaining attention for prolonged periods of time and would need redirection from adults in a group setting in order to complete assigned tasks. Tr. 439. In the area of interacting and relating to others, Dr. Faust noted that RSW reportedly had some limitations in his ability to interact with others due to difficulty with attention and increased activity levels. Tr. 439-440. In the area of self-care, Dr. Faust found that RSW could complete self-care activities with structure and reminders from his mother. Tr. 440. In conclusion, Dr. Faust stated, "the child is exhibiting

borderline intellectual ability and symptoms of ADHD which would impair his ability to function." Tr. 440.

**D. Testimonial Evidence**

At the hearing before the ALJ on June 13, 2018, Plaintiff and Claimant appeared with counsel and testified.  Tr. 51-52.  Claimant testified first.  Tr. 56.  Thereafter, the Claimant was excused from the hearing room and Plaintiff testified. Tr. 56.

**1. Claimant's Testimony**

With Claimant's mother and counsel present, the ALJ examined the Claimant.  Tr. 56-60. The Claimant had finished fifth grade and was going to be entering sixth grade.  Tr. 56. Claimant's favorite classes in fifth grade were English Language Arts and Science.  Tr. 56-57. Claimant stated that he liked those two classes because he likes to read.  Tr. 57.  Claimant's least favorite class is math.  Tr. 58.  He did not like doing division or fractions.  Tr. 58.

Claimant enjoys reading about football and football players.  Tr. 57.  Claimant also plays football.  Tr. 57.  At his prior home, Claimant used to play outside with friends but, at his new home, he did not have friends nearby so he did not play outside with friends.  Tr. 57-58. Claimant enjoys playing video games.  Tr. 58.  He plays against the computer not online against other people.  Tr. 58.

At school, Claimant had a group of guy friends that he liked to spend time with.  Tr. 58-59.  He only saw them while at school and did not talk to them by phone, text or on the computer.  Tr. 59.

At home, Claimant has chores to do, including feeding his dog, cleaning his room, taking out the trash, and cleaning the dishes.  Tr. 59-60.  Claimant indicated that he sometimes needs a reminder to do his chores.  Tr. 60.

### 2. **Plaintiff's Testimony**

After Claimant testified and exited the hearing room, with counsel present, Plaintiff testified.  Tr. 64-79.  Plaintiff clarified that Claimant was playing football in a community-based football league.  Tr. 64.  It was Claimant's first time playing football and practices had just started the prior week.  Tr. 64.  Plaintiff felt that her son was enjoying playing on the team.  Tr. 65.  Plaintiff had decided to sign her son up for the team because she thought it would allow him to interact with other children.  Tr. 65.  She also thought it would help him with teambuilding.  Tr. 65.  Plaintiff was interested to see how Claimant would do because it usually takes him some time to learn to do things.  Tr. 65-66.  Plaintiff's decision to allow Claimant to join the football team was also in part a reward for him working hard in school all year and not getting suspended.  Tr. 66.  Plaintiff tries to provide Claimant with incentives to encourage him to do better at home and in school.  Tr. 66-67.

Plaintiff and Claimant lived together with no other family members.  Tr. 67.  Plaintiff's grandchildren, ages four and five, come over every day.  Tr. 67.  Claimant plays with and gets along pretty well with his cousins when they visit.  Tr. 67.  Plaintiff stated that she and Claimant got along.  Tr. 67.  Her son follows her directions.  Tr. 67-68.  Sometimes Claimant will do his chores without any reminders from Plaintiff but sometimes Plaintiff has to give Claimant reminders.  Tr. 68-69.  Plaintiff explained that Claimant loses his focus at times and Plaintiff has to redirect him.  Tr. 68, 69-70.

Claimant talks about his friends at school.  Tr. 70.  As far as friends in the neighborhood, Plaintiff explained that there are not a lot of kids his age nearby, which is another reason she signed him up for football.  Tr. 70.  At their old house, there were kids Claimant's age that he could go outside and play with every day.  Tr. 70.  Plaintiff felt that Claimant got along pretty

well with other kids and he got along well with his teachers.  Tr. 71.  Claimant did not have any suspensions or detentions during the prior school year.  Tr. 71.

Claimant was taking a new medication for his ADHD and he was also taking melatonin to help him sleep at night.  Tr. 71.  The ADHD medication helps Claimant stay focused on tasks during school and the melatonin helps Claimant get a good night's sleep.  Tr. 71.  If Claimant misses a couple of days of his ADHD medication, his teachers have noticed a difference in Claimant and have called Plaintiff, noting that they thought Claimant had not taken his medication because he was not focused.  Tr. 72.  During the summer months, Plaintiff does not give Claimant his ADHD medication because Claimant is home with her and she is able to handle him.  Tr. 72.  When school is in session, he needs his medication to stay focused.  Tr. 72.  Plaintiff had given Claimant his ADHD medication on the day of the hearing.  Tr. 72.  Claimant does not have negative side effects from his medications.  Tr. 72.

Claimant previously received speech therapy but he had been taken out of therapy.  Tr. 72-73.  As Plaintiff understood it, Claimant's teachers did not think that Claimant needed speech therapy any longer because he was reading out loud and that was helping him more.  Tr. 72-73.

There have been some issues with Claimant not doing his homework so Plaintiff now has to ask Claimant every day whether he has done his homework.  Tr. 73.  Claimant has an IEP at school.  Tr. 73-74.  Plaintiff is not certain that the IEP helped Claimant improve but she noted that the IEP helps with knowing what Claimant's goals should be and to help him reach those goals.  Tr. 74.  Plaintiff recognized that Claimant's math scores had improved.  Tr. 74.  Since Claimant's math scores had improved and since Plaintiff was unable to assist Claimant with his math, she assumed he was getting some additional math help at school.  Tr. 74.  Also, at times, Plaintiff would call her older son to help Claimant with his math.  Tr. 74.  Plaintiff helps

17

Claimant with reading and with his homework when he brings it home.  Tr. 75.  Claimant has an intervention specialist – Mrs. Townsend – at school.  Tr. 77-78.  Plaintiff was not certain how often Mrs. Townsend took Claimant out of the classroom to work with him but she estimated two or three times per week.  Tr. 77.

Claimant was receiving services through Murtis Taylor.  Tr 75-76.  When Claimant first started at Murtis Taylor he was depressed.  Tr. 75.  There had been some improvement but Plaintiff was not certain Claimant was no longer depressed.  Tr. 75.  He had an upcoming diagnostic test scheduled.  Tr. 75.  Claimant has some anger problems.  Tr. 75-76.  Plaintiff explained that if Claimant gets upset about something he will act out sometimes.  Tr. 76.  Claimant has acted out both at home and at school.  Tr. 76.  At school, Claimant has cried and yelled, causing the school to have to call Plaintiff so she can talk to him.  Tr. 76.  Plaintiff estimated that Claimant had acted out in that manner two or three times during the preceding school year.  Tr. 76.

Plaintiff has to remind Claimant to take a shower.  Tr. 76-77.  Once reminded, Claimant will take a shower.  Tr. 76-77.  Although Claimant does not have any issues staying awake during school, Claimant takes a two hour nap every day after school.  Tr. 77.

Plaintiff felt that her son's condition at the time of the hearing as compared to the period before October 2015 to be the same.  Tr. 78.  She explained that his speech issues were the same.  Tr. 78.  Her son was still unable to pronounce certain words and needs his speech corrected.  Tr. 78.  Also, Claimant continues to act out in anger at times.  Tr. 78.  Claimant does not have a long attention span.  Tr. 78.  Claimant plays a video game for about 10-20 minutes and then he might watch television.  Tr. 78-79.  He might watch television for about 30 minutes and then he might return to playing a video game or bounce a ball.  Tr. 79

18

### III. The ALJ's Decision

In his August 16, 2018, decision, the ALJ made the following findings:[4]

1. The most recent favorable medical decision finding that the claimant was disabled is the determination dated April 25, 2011, which is known as the "comparison point decision" or CPD. Tr. 20.

2. At the time of the CPD, Claimant had the following medically determinable impairments: attention-deficit hyperactivity disorder ("ADHD") and borderline intellectual functioning ("BIF"). Tr. 20. ADHD was found to meet Listing 112.11A and B. Tr. 20.

3. Medical improvement occurred as of October 8, 2015. Tr. 20-21.

4. Since October 8, 2015, the impairments that the Claimant had at the time of the CPD have not met or medically equaled and Listing as written at the time of the CPD. Tr. 21-23.

5. The Claimant was born on October 6, 2006. Tr. 23. He was a school-age child as of October 8, 2015, and is currently a school-age child. Tr. 23.

6. Since October 8, 2015, the impairments that the Claimant had at the time of the CPD have not functionally equaled the Listings. Tr. 23-41. Under each of the six domains, the ALJ conducted an evaluation of the limitations caused by the impairments that were present as of the CPD, finding Claimant had less than marked limitation in acquiring and using information; marked limitation in attending and completing tasks; less than marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; less than marked limitation in the ability to care for himself; and no limitation in health and physical well-being. Tr. 31-41.

7. The medical and other evidence establish that the Claimant did not have an impairment at the CPD that was not considered at that time and the Claimant has not developed any additional impairments subsequent to the CPD. Tr. 41.

8. Since October 8, 2015, the Claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments. Tr. 42.

9. Since October 8, 2015, the Claimant has not had an impairment or combination of impairments that functionally equals the listings. Tr. 42.

---

[4] The ALJ's findings are summarized.

10.     The Claimant's disability ended as of October 8, 2015, and the Claimant
        has not become disabled again since that date.  Tr. 42.

Based on the foregoing, the ALJ determined that Claimant's disability ended as of

October 8, 2015, and the Claimant has not become disabled again since that date.  Tr. 42.

### IV. Plaintiff's Arguments

Plaintiff argues that the ALJ erred (1) when he found RSW was no longer disabled; (2)

when he found that RSW did not have marked limitations in the domains of acquiring and using

information and interacting and relating to others; and (3) when he failed to find new severe

impairments of adjustment disorder and dysthymic disorder.  Doc. 12, pp. 1-2, 13-20; Doc. 16.

### V. Law & Analysis

#### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be

conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B.  Standard for Childhood Disability

The standard for evaluating a child's disability claim differs from that used for an adult.  42 U.S.C. § 1382c(a)(3)(C).  A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).  To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 Fed. Appx. 146, 147 (6th Cir. 2002).  At Step One, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At Step Two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals, or functionally equals a listing.  20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the Listings, the Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. § 416.926a(a).  The Commissioner will consider how a child functions in six domains: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations[5] in two domains, or an "extreme" limitation[6] in one domain, the

---

[5] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than

impairments functionally equal the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).

### C. Continuing Disability Review

Once a determination has been made that a child is eligible for disability benefits, the regulations provide that continued eligibility for benefits must be reviewed periodically.  20 C.F.R. § 416.944a(a).  The SSA looks at a number of factors to determine whether a child's disability continues.  20 C.F.R. § 416.944a(a)(1).

First, a determination is made as whether there has been medical improvement in the impairment the child had at the most recent favorable determination or decision.  20 C.F.R. § 416.944a(b)(1).  The regulations explain that, "Medical improvement is any decrease in the medical severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable decision that [the claimant] [was] disabled or continued to be disabled. Although the decrease in severity may be of any quantity or degree, we will disregard minor changes in [the claimant's] signs, symptoms, and laboratory findings that obviously do not represent medical improvement and could not result in a finding that your disability has ended."  20 C.F.R. § 416.944a(c).  "If there has been no medical improvement," the child's disability will be found to continue unless one of the exceptions to medical improvement is found to apply.[7]  20 C.F.R. § 416.944(b)(1).

---

extreme."  *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id*.

[6] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked." *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id*.

[7] The exceptions to medical improvement are described in paragraphs (e) and (f) of 20 C.F.R. § 416.944a.

Second, "[i]f there has been medical improvement, [the SSA] will consider whether the impairment(s) that [were] considered at the time of [the] most recent favorable determination or decision still meets or equals the severity of the listed impairment it met or equaled at that time." 20 C.F.R. § 416.944a(b)(2).  "If that impairment(s) does not still meet or equal the severity of that listed impairment," the analysis will proceed to the next step.  *Id.*  "If that impairment(s) still meets or equals the severity of that listed impairment as it was written at that time," the claimant will be found to be still disabled, unless one of the exceptions to medical improvement applies. *Id.*

Third, "[i]f there has been medical improvement in the impairment(s) that [was] considered at the time of [the] most recent favorable determination or decision, and if that impairment(s) no longer meets or equals the severity of the listed impairment that it met or equaled at that time, [the SSA] will consider whether [the claimant] [is] disabled under the rules in §§ 416.924(c) and (d)."  20 C.F.R. § 416.944a(b)(3).  As explained above those rules include assessing whether there is a severe impairment and, if yes, whether the claimant has an impairment, or combination of impairments, that meets, medically equals, or functionally equals a listing.  20 C.F.R. §§ 416.924 (c) and (d).  When assessing whether the claimant is currently disabled, all impairments that the claimant now has, including any that the claimant did not have at the time of the most recent favorable determination or decision, or that were not considered at that time, are to be considered.  20 C.F.R. § 416.944a(b)(3).

## D.  The ALJ did not err in finding medical improvement and that RSW was no longer disabled

In arguing that the ALJ erred in finding that RSW was no longer disabled, Plaintiff contends that the RSW's school records, in particular his IEPs for the periods of March 2017 through March 2018 and March 2018 through February 2019 support a finding that RSW had a

continuing disability.  Doc. 12, pp. 14-15; Doc. 16, pp. 1-3.  Thus, Plaintiff argues that the ALJ erred in finding medical improvement.  Doc. 12, pp. 13-15.

The ALJ found that, as of October 8, 2015, there had been a decrease in medical severity of RSW's impairments that were present at the time of the CPD.  Tr. 20-21.  In reaching his conclusion, the ALJ considered medical evidence existing at the time of the CPD and evidence as of the continuing disability review ("CDR"), including Dr. Faust's consultative evaluation and school records.  Tr. 20-21.  The ALJ concluded:

> In sum, the evidence supports that the claimant has experienced medical improvement related to his ADHD and ability to acquire and use information as evinced by his relative success in school despite non-compliance with medication, as is more fully discussed in this decision.  Accordingly, the claimant experienced medical improvement as of the continu[ing] disability review.

Tr. 21.

Plaintiff contends that the ALJ did not properly consider and weigh evidence, i.e., school IEP and ETR records, which reflected the need for extra services in math and English, below average testing scores, and limited level proficiency test performance, when finding there had been medical improvement.  Doc. 12, pp. 14-15.  However, the ALJ considered RSW's school records when assessing whether there had been medical improvement.  The ALJ observed that:

> School records note the claimant always makes an effort to complete his assignments but he can be easily distracted, and occasionally requires prompts to stay on task.  His accommodations include small group, extended time, test directions and questions read and clarified, and frequent breaks.  His intelligence testing supports the diagnosis of BIF.

Tr. 21.  Also, as Plaintiff acknowledges, the ALJ considered and weighed the IEPs and ETRs, assigning them partial weight.  Doc. 12, p. 14; Tr. 30.  The ALJ explained that, with implementation of accommodations, Claimant's school performance improved notwithstanding "general non-compliance with mental health treatment and medication."  Tr. 30.  And, the ALJ

further explained that, while special accommodations were required, the accommodations did not support marked or greater functional limitations.  Tr. 30.

While Plaintiff contends that the school records show that Claimant's condition had not improved and he was still having marked difficulties at school, Plaintiff has not shown that the ALJ ignored or failed to consider the school records or that the weight the ALJ assigned to the school records is not supported by substantial evidence.  And, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Furthermore, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner,* 745 F.2d at 387.  The ALJ's decision makes clear that the ALJ fully considered the school records and found that, notwithstanding some difficulties in school, there had been medical improvement and/or his limitations were not as marked as Plaintiff alleged.

Plaintiff also argues that the ALJ erred by providing great weight to the opinions of state agency medical consultants Drs. Stroebel and Rosenfield but only partial weight to the opinion of Nurse Kaput.  Doc. 12, pp. 15-16; Doc. 16, p. 2.   Plaintiff asserts that Drs. Stroebel and Rosenfield based their findings of less than marked limitations in acquiring and using information and interacting and relating with others on RSW's improved IQ and because his speech provided no limitation.  Doc. 12, p. 15.  Plaintiff states that, when reaching these findings, the physicians mentioned, but failed to rely on, the fact that RSW had difficulty understanding complex or multi-step instructions and needed them presented in small segments and that RSW's speech was fairly simplistic for his age and he appeared to have a flat affect. Doc. 12, p. 15 (citing Tr. 672, 678).  Plaintiff then contends that the ALJ erroneously ignored

these observations.  Doc. 12, p. 15.  The ALJ did not ignore the observations noted by the state

agency medical consultants, which were observations based on the consultative psychologist's

evaluation.  Tr. 672, 678.  Rather, when assessing RSW's limitations in the domain of acquiring

and using information, the ALJ specifically discussed Dr. Faust's observations regarding

difficulty with multi-step instructions and the need to provide small segments of information and

the fact that the state agency medical consultants considered those observations but found less

than marked limitation in acquiring and using information.  Tr. 33.  Also, when discussing the

interacting and relating to others domain, the ALJ specifically addressed RSW's issues with

speech, finding that his speech intelligibility had improved to the extent that speech and language

services were no longer needed.  Tr. 37.

       Further, Plaintiff argues that, because the state agency medical consultants did not review

the entire record, the ALJ erred in assigning great weight to their opinions.[8]  Doc. 16, p. 2.

However, an ALJ is not precluded from considering and relying upon opinions of state agency

reviewing physicians even when those physicians have not reviewed the entirety of the record.

*See Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011) ("There is no

categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more

detailed and comprehensive' case record.") (discussing SSR 96-6p, 1996 WL 374180, at *2

(1996)).  "Where a non-examining source did not review a complete case record, [courts] require

some indication that the ALJ at least considered these facts before giving greater weight to that

opinion."  *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (quoting *Blakley v.

Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (internal quotations omitted)).  Here, the

---

[8] Plaintiff relies on *Lane v. Comm'r of Soc. Sec.*, 2019 WL 7290960 (N.D. Ohio Dec. 30, 2019), in support of this
argument.  However, the court in *Lane*, 2019 WL 7290960, subsequently reconsidered its decision and concluded
that the ALJ had not erred in assigning more weight to the opinion of a non-examining source over a treating
physician.  *Lane v. Comm'r of Soc. Sec.*, 2020 WL 2190474 (N.D. Ohio Feb. 19, 2020).

ALJ considered the fact that evidence of record was developed after the state agency medical consultants rendered their opinions, stating that "evidence of record developed after they rendered their opinions did not change materially on in a manner that would otherwise render their opinions inconsistent with the records generally."  Tr. 28.  Furthermore, Plaintiff has not shown that the ALJ's decision to assign great weight to their opinions is not supported by substantial evidence.

Plaintiff also argues that the ALJ erred in finding medical improvement because the ALJ "erroneously and summarily discounted" the opinion of Nurse Kaput and he "failed to consider her opinion in light of the fact that she treated R.S.W."  Doc. 12, p. 16.  Plaintiff's arguments in this regard are unsupported by the record.  The ALJ did not summarily discount the opinion of Nurse Kaput.  Tr. 28-29.  He recognized that, although Nurse Kaput was not an acceptable medical source subject to controlling weight evaluation, she was an other source and her opinion was subject to evaluation under the regulations.  Tr. 29.  The ALJ then proceeded to provide a detailed explanation of reasons for assigning only partial weight to her opinion.  Tr. 29.  For example, the ALJ explained that Nurse Kaput treated RSW, but only twice.  Tr. 29.  Also, the ALJ noted that Nurse Kaput's opinion did not indicate that RSW had been non-compliant with his ADHD medication.  Tr. 29.  Plaintiff has not shown that the ALJ summarily discounted Nurse Kaput's opinion or that the ALJ's reasons for discounting Nurse Kaput's opinion are unsupported by substantial evidence.

Plaintiff also argues that the ALJ erred because he assigned great weight to Mrs. Townsend's questionnaire but failed to note or include in his assessment of the functional domains Mrs. Townsend's findings that RSW had obvious problems in the areas of comprehending and doing math problems, understanding and participating in class discussions,

providing organized oral explanations and adequate descriptions, and recalling and applying previously learned material which were in addition to RSW's serious problems in the areas of expressing ideas in written form and applying problem-solving skills in class discussions.  Doc. 12, p. 16; Doc. 16, p. 3.  The ALJ provided a very detailed discussion of Mrs. Townsend's opinion.  He stated:

> The undersigned gives great weight to the opinion and observations of the claimant's intervention specialist for the 2017-2018 school year, Mrs. Townsend, set forth in a Teacher Questionnaire dated April 10, 2018.  (18E).  She opined that the claimant has a "serious problem" with expressing ideas in written form and applying problem solving skills in class discuss[ions]; however, she noted that the clamant has a "slight problem" to an "obvious problem" in the remaining eight areas of acquiring and using information. (18E/2).  As to attending and completing tasks, she noted "serious problem" in carrying out multi-step instructions, organizing his materials, and completing class/homework assignments.  (18E/3).  In the other areas ten areas of attending and completing tasks listed on the questionnaire, she noted a fairly even distribution of "no problem", a "slight problem" and an "obvious problem."  (18E/3).  As to interacting with others, she noted that the claimant has a "serious problem" with seeking attention, interpreting meaning of facial expression, and using adequate vocabulary to express his ideas in conversation.  (18E/4).  She noted a fairly even distribution of "no problem", a "slight problem" and an "obvious problem" in the remaining ten areas listed in that section regarding interacting and relating with others. (18E/4).  She also noted that the claimant does not have a behavior plan, but they use strategies to manage the claimant's frustration in the classroom.  (18E/4).  She also noted that she is able to understand 1/2 to 1/3 of his speech on first attempt and almost all on repetition. (18E/5). As to moving about and manipulating objects, and caring for himself, she noted no limitations.  (18E/5 and 6).  The undersigned construes this opinion and observations as consistent with the evidence of record generally, and the Domains of Functioning Analysis set forth below.  At the time she rendered the opinion, the teacher had regular contact with the claimant and observed the impact his impairments have on his functioning while in school.   As an intervention specialist, she is trained and experienced in working with children facing various challenges in the school environment.  Her opinion and observations are consistent with the evidence generally. The teacher's opinion and observations are highly persuasive based on these facts. Accordingly, the undersigned gives great weight to this opinion.

Tr. 31.  While the ALJ did not specifically list every "obvious" problem noted by Mrs. Townsend, Plaintiff does not point to legal authority indicating that failure to do so is reversible

error.  Furthermore, the ALJ acknowledged that, in addition to Mrs. Townsend's observations of

"serious problems," she also observed "obvious problems" in the various domains, including in

the domains of acquiring and using information and interacting and relating to others.  Moreover,

Plaintiff has not shown how an "obvious problem" equates with a marked limitation and she has

provided no legal authority to support her contention that, because the ALJ assigned great weight

to Mrs. Townsend's opinion, the ALJ was required to incorporate every limitation, whether

slight, obvious, serious or otherwise into his assessment.  Further, even though Mrs. Townsend

rated RSW has having a "serious problem" in some areas within the domains of acquiring and

using information and interacting and relating to others, the majority of areas were rated as less

than "serious."  Tr. 31.  Considering the ratings in total, Plaintiff has not shown it was error for

the ALJ to find less than marked limitations in those domains.  *See e.g.*, *Jenkins on behalf of LJ

v. Comm'r of Soc. Sec.*, 2017 WL 1093759, * 9 (N.D. Ohio Mar. 23, 2017) (finding no error

where the ALJ found less than marked limitations in the domain of acquiring and using

information where the claimant's teacher rated claimant as overall having a "serious problem" in

the domain but also found claimant having less of a problem in several other areas within the

domain).

### E.  The ALJ did not err in finding that RSW did not have marked impairments in the domains of acquiring and using information and interacting and relating to others

Plaintiff argues that the ALJ erred in finding Plaintiff had less than marked limitations in

the domains of acquiring and using information and interacting and relating to others.  Doc. 12,

pp. 16-19.  She asserts that the ALJ ignored evidence that would have supported marked

limitations in the domains.  Doc. 12, p. 19.

Although Plaintiff contends that the ALJ ignored evidence, she fails to identify the

evidence that was ignored.  Rather, Plaintiff disagrees with the ALJ's analysis of the evidence.

She argues that the evidence supports greater limitations in the domains of acquiring and using information and interacting and relating to others than the ALJ found.  For example, she argues that evidence from the consultative evaluation and school records demonstrate that RSW had marked limitations in the domain of acquiring and using information, pointing out that, during the consultative evaluation, RSW had difficulty understanding complex or multi-step instruction and his speech was fairly simplistic for his age and school records show that RSW was reading below grade level, did not work well in groups, and required pull-out sessions for math and ELA. Doc. 12, p. 18.   However, in addition to other evidence of record, the ALJ considered school records and findings from the consultative evaluation when assessing the degree of RSW's limitation in the domain of acquiring and using information.  Tr. 31-34.  In doing so, the ALJ concluded that RSW had less than marked limitation in this domain.  As explained above, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Furthermore, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner,* 745 F.2d at 387.  The ALJ's decision makes clear that the ALJ fully considered the evidence of record when assessing the functional domains of acquiring and using information and interacting and relating to others.

Plaintiff also argues that the ALJ's evaluation of his impairments was not consistent with the "whole child" approach as set forth in Social Security Ruling 09-1p.  Doc. 12, p. 17.  The technique for determining functional equivalence known as the "whole child" approach "accounts for all of the effects of a child's impairments singly and in combination—the interactive and cumulative effects of the impairments—because it starts with a consideration of

30

actual functioning in all settings."   SSR 09-1p, 2009 WL 396031, * 2 (Feb. 17, 2009).  The whole child approach to functional equivalence involves a comparison of how the child is functioning in relationship to his or her peers. *Id.* (functional equivalence to a listed impairment requires consideration of "how the child functions every day and in all settings compared to other children the same age who do not have impairments.").  Plaintiff's "whole child" approach argument is vague and undeveloped.  Further, the ALJ acknowledged the need to evaluate how RSW performed activities as compared to other children his same age who do not have impairments.  Tr. 23-24.  And, Plaintiff has not shown that the ALJ failed to undertake that analysis when assessing whether RSW's impairments functionally equaled a listing.

### F.  The ALJ did not err by failing to find adjustment disorder and dysthymic disorder were severe impairments

Plaintiff argues that the ALJ erred when he failed to find new severe impairments of adjustment disorder and dysthymic disorder.  Doc. 12, pp. 19-20: Doc. 16, pp. 3-4.  Plaintiff contends that there was evidence showing that RSW's adjustment disorder and dysthymic disorder caused more than minimal functional limitations.  Doc. 12, p. 20.  Plaintiff points to her statements that RSW was depressed; school records, indicating that RSW was sad and often cried; and diagnoses made by an advanced practice nurse of ADHD, dysthymia, and adjustment disorder with mixed anxiety and depressed mood.  Doc. 12, p. 20.

The ALJ acknowledged diagnoses in the record of adjustment disorder, dysthymic disorder, and disruptive behavior disorder.  Tr. 41, 649, 652.  However, the ALJ explained that establishing a medically determinable impairment requires evidence from an acceptable medical source and therapist and nurse practitioners are not acceptable medical sources.  Tr. 41.  Therefore, the ALJ did not consider those conditions.  Tr. 41.  Plaintiff does not disagree that, at the time Claimant's application was filed, nurse practitioners were not acceptable medical

sources.  Doc. 16, p. 4.  Plaintiff argues though that the regulations have since been amended, for cases filed after March 27, 2017, to include an advanced practice nurse in the list of acceptable medical sources.  *Id.*  Plaintiff is correct that the regulations have been amended to now include licensed advanced practice nurses in the list of acceptable medical sources.  20 C.F.R. § 416.902(a)(7).  However, the regulations, as acknowledged by Plaintiff, apply only to claims filed on or after March 27, 2017.  Thus, Plaintiff is unable to show that the ALJ erred by concluding that the diagnoses pointed to by the Plaintiff were not established by an acceptable medical source.

Also, Plaintiff cannot rely on her lay observations that RSW was depressed to establish a medically determinable severe impairment.  The ALJ considered Plaintiff's observations and opinions and testimony, noting that since she was not medically trained the accuracy of her observations and opinions was questionable.  Tr. 30.  Additionally, Plaintiff has not shown how an IEP school record that indicates that RSW could be shy and sad at times and often cried (Tr. 372) establishes a medically determinable severe impairment.  Moreover, that same record notes that RSW's "Anxious/Depressed, Withdraw/Depressed . . .  were all within normal range of behavior."  Tr. 372.

## VI.  Conclusion and Recommendation

For the reasons discussed herein, the undersigned finds that Plaintiff has not shown error with respect to the ALJ's decision and findings that RSW was no longer disabled.  Accordingly, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

Dated:  July 1, 2020

/s/ Kathleen B. Burke
_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).